UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| GAYLE LINKLETTER, | : | Case No. 1:15-cv-162 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| WESTERN & SOUTHERN FINANCIAL GROUP, INC., *et al.*, | : | |
| | : | |
| Defendants. | : | |

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS (Doc. 10)**

This civil action is before the Court on the motion to dismiss of Defendants Western & Southern Financial Group, Inc. and Kim Chiodi (Doc. 10) and the parties' responsive memoranda (Docs. 12, 14, and 17).[1]

### I.  FACTS <u>AS ALLEGED</u> IN THE COMPLAINT

For purposes of this motion to dismiss, the Court must: (1) view the complaint in the light most favorable to Plaintiff; and (2) take all well-pleaded factual allegations as true. *Tackett v. M&G Polymers*, 561 F.3d 478, 488 (6th Cir. 2009).

---

[1] Plaintiff seeks oral argument on Defendants' motion. (Doc. 12 at 20). S.D. Ohio Civ. R. 7.1(b)(2) provides for oral argument where it "is deemed to be essential to the fair resolution of the case because of its public importance or the complexity of the factual or legal issues presented[.]"  Here, the Court finds that the factual and legal issues are clear on their face, so oral argument is not necessary. *See Whitescarver v. Sabin Robbins Paper Co.,* Case No. C–1–03–911, 2006 WL 2128929, at *2, (S.D. Ohio July 27, 2006) ("Local Rule 7.1(b)(2) leaves the Court with discretion whether to grant a request for oral argument.").

Plaintiff Gayle Linkletter started her career in corporate communications in 1980, working as a marketing consultant and director of editorial services at American Field Service Intercultural Programs in New York City.  (*See* Doc. 1 at ¶ 12).  From 1997 to 2006, Plaintiff worked at Defendant Western & Southern Financial Group, Inc. ("Western & Southern") as a manager of corporate communications.  (*Id.* at ¶ 14).  Western & Southern gave Linkletter regular raises and very positive performance evaluations.  (*Id.* at ¶ 15).  In 2006, Linkletter left Western & Southern to accept a job with an international company based in Cincinnati as manager of global corporate communications.  (*Id.* at ¶ 16).  Currently, Linkletter does work as a communications consultant for three non-profit organizations in the Cincinnati area.  (*Id.* at ¶ 17).

In May 2014, while she was working with those non-profits, one of Linkletter's former Western & Southern colleagues contacted her regarding a job opening at the company.  (Doc. 1 at ¶ 77).  On August 25, 2014, after several rounds of interviews, Western & Southern offered Linkletter a position as a senior corporate communications specialist, with a salary of $80,000 per year.  (*Id.* at ¶ 85).   Linkletter accepted the position.  (*Id.* at ¶ 86).

On September 8, 2014, while Linkletter was waiting to start work, Defendant Kim Chiodi, Senior Vice President of Human Resources at Western & Southern, called Plaintiff. (Doc. 1 at ¶¶ 87–88).  Chiodi said that Western & Southern was rescinding its employment offer. (*Id.* at ¶ 89).  The reason was that Linkletter had taken "a position that was contrary to Western & Southern."  (*Id.* at ¶ 91).

2

Chiodi indicated that Linkletter's "contrary" position was her support for the rights of women of the Anna Louise Inn. (*See* Doc. 1 at ¶¶ 92–95).[2] The Anna Louise Inn is a social service facility for women, located on the east side of downtown Cincinnati [until very recently]. (*Id.* at ¶¶ 18, 20). The Anna Louise Inn offers a program designed to help women break a cycle of drug addiction and prostitution. (*Id.* at ¶ 21). The Anna Louise Inn facility was [until very recently] next to Lytle Park, about a block from Western & Southern's corporate headquarters. (*Id.* at ¶¶ 20, 25).

In August 2010, Cincinnati City Council announced that the Anna Louise Inn facility would undergo a $12 million renovation. (Doc. 1 at ¶ 32). In January 2011, John Barrett, Western & Southern's Chief Executive Officer, declared that, as part of its "master plan for this end of town," Western & Southern wanted to buy the Anna Louise Inn property to develop high-end condos. (*Id.* at ¶¶ 36–37). Anna Louise Inn officials did not want to sell the property. (*Id.* at ¶¶ 37–39). For five years, Western and Southern battled with the Anna Louise Inn over the women's right to live in the Lytle Park neighborhood. (*See id.* at ¶¶ 30–76).

Western & Southern engaged in a multi-pronged campaign to force the Anna Louise Inn out of the Lytle Park area. (Doc. 1 at ¶ 40). On December 16, 2010, Mario San Marco, president of Eagle Reatly Group, which controls Western & Southern's real estate holdings, sent a letter to Cincinnati's mayor, arguing that the proposed renovation

---

[2] Specifically, Plaintiff asked, "You mean the Anna Louise Inn? I thought that situation was over." (*Id.* at ¶ 92). Chiodi stated that the Anna Louise Inn issue was "not over." (*Id.* at ¶ 95). She also stated "We can't take the risk of having someone on staff who is opposed to us. It's too big of a risk for us. It might be used against us." (*Id.*)

3

and expansion of the Anna Louise Inn was "not appropriate for the Lytle Park neighborhood." (*Id.* at ¶¶ 29, 41). San Marco specifically objected to "85 low-income permanent housing units for women" and "housing for up to 25 recovering prostitutes." (*Id.* at ¶ 42). He calculated that the "population of Anna Louise Inn would represent approximately 50% of the residents in the neighborhood." (*Id.* at ¶ 44). Western & Southern argued that for "a really successful neighborhood to develop . . . you've got to have a consistent experience." (*Id.* at ¶ 45). As Barrett put it, "There's nothing like [Anna Louise Inn] around here, so why is that here?" (*Id.* at ¶ 46). At one meeting, representatives from Western & Southern were asked "What do you really want?" (*Id.* at ¶ 47). The company spokesperson answered: "We want [the Anna Louise women] out of there." *Id.*

On May 27, 2011, Western & Southern filed a lawsuit against Anna Louise Inn, alleging that its facility was improperly zoned. (Doc. 1 at ¶ 49). The lawsuit effectively froze the Anna Louise Inn's renovation plans. (*Id.* at ¶ 50). In response, the residents of the Anna Louise Inn filed their own lawsuit against Western & Southern, alleging that the company was trying to drive them out of the neighborhood in violation of the Fair Housing Act and the Ohio Civil Rights Act. (*Id.* at ¶¶ 51–52). The residents alleged that Western & Southern had "undertaken a campaign to drive Anna Louise Inn and its female residents out of Lytle Place[.]" (*Id.* at ¶ 52). The residents also alleged that Western & Southern's conduct included "vilifying the female residents of Anna Louise Inn, photographing residents without their permission, falsely accusing residents of Anna Louise Inn of engaging in criminal activity and other 'inappropriate behavior' in the

4

neighborhood. (*Id.* at ¶ 53). On November 15, 2011, Western & Southern filed a motion to dismiss the Anna Louise Inn lawsuit. (Doc. 1 at ¶ 54). On March 14, 2012, the Court denied the motion, holding that Anna Louise Inn <u>residents</u> stated housing discrimination claims based on Western & Southern's conduct. (*Id.* at ¶ 55).

While these lawsuits were playing out in the courts, numerous individuals and organizations spoke out on behalf of Anna Louise Inn. (Doc. 1 at ¶ 56). For instance, on October 12, 2011, more than twenty representatives from religious organizations, along with other individuals and social-justice entities, passed a resolution to support "the Anna Louise Inn [which] has provided safe and affordable housing for women for 102 years in its current location, the Lytle Park District." (*Id.* at ¶ 57). On July 25, 2012, national and local fair housing organizations issued a statement, explaining that the fair housing laws "apply to neighbors who try to drive someone out of their home through harassment, intimidation, or coercion." (*Id.* at ¶ 59). They urged Western & Southern "to cease its opposition to the Anna Louise Inn and become a welcoming good neighbor who values neighborhood diversity." (*Id.*)

Linkletter publicly supported the women of the Anna Louise Inn. (*See* Doc. 1 at ¶¶ 61–74). She showed her support by signing a petition, along with over 900 other individuals, expressing her support for the right of the Anna Louise Inn women to live in the neighborhood of their choice. (*Id.* at ¶¶ 62–65). The petition was titled: "The Anna Louise Inn has my Support!" (*Id.* at ¶ 62). The text of the petition states: "I support the mission of the Anna Louise Inn, which has provided safe and affordable housing for women for 102 years in its current location." (*Id.*) As a signor, Linkletter stated that she

appreciated "that women in Cincinnati have an option for permanent supportive housing" near Lytle Park. (*Id.*) In addition, she stated that the "Anna Louise Inn should remain where it is and continue its mission of providing safe affordable housing for single women." (*Id.*) Many of the individuals and organizations that had previously expressed their public support for the women of Anna Louise Inn also signed the petition. (*Id.* at ¶ 64). The Anna Louise Inn posted this petition with the names of the signors, including Linkletter, on a website, under the title "Supporters of the Anna Louise Inn." (*Id.* at ¶ 65).

Linkletter also made annual contributions to the Anna Louise Inn in 2012 and 2013. (Doc. 1 at ¶ 66). The Anna Louise Inn listed Linkletter as a donor in its "2012 annual report" and "2013 annual report," which were posted on a website. (*Id.* at ¶¶ 66–67). Also, while walking on a public sidewalk in front of Western and Southern headquarters, Linkletter encountered a man standing on the sidewalk who was silently holding a sign that said "Support Anna Louise Inn" or "Support the Women of Anna Louise Inn." (*Id.* at ¶¶ 68–69). Linkletter paused briefly to thank the man for what he was doing. (*Id.* at ¶ 70).

Plaintiff alleges claims based on the federal Fair Housing Act, 42 U.S.C. § 3601, *et seq.* (including, but not limited to, 42 U.S.C. § 3617), and the Ohio Civil Rights Act, Ohio Rev. Code ("O.R.C.") § 4112.01, *et seq.* (including, but not limited to, O.R.C. § 4112.02(H)(12), (I)). (Doc. 1 at ¶¶ 108–13). Plaintiff also seeks a declaration that "Western & Southern's employment practice of screening prospective employees for FHA and OCRA opposition is illegal." (*Id.* at ¶ 115).

6

## II.  STANDARD OF REVIEW

A motion to dismiss brought pursuant to Fed. R. Civ. P. 12(b)(6) operates to test the sufficiency of the complaint and permits dismissal of a complaint for "failure to state a claim upon which relief can be granted." To show grounds for relief, Fed. R. Civ. P. 8(a) requires that the complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief."

While Fed. R. Civ. P. 8 "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). Pleadings offering mere "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (citing *Twombly*, 550 U.S. at 555). In fact, in determining a motion to dismiss, "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation[.]'" *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265 (1986)). Further, "[f]actual allegations must be enough to raise a right to relief above the speculative level[.]" *Id.*

Accordingly, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678. A claim is plausible where "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

7

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief,'" and the case shall be dismissed. *Id.* (citing Fed. R. Civ. P. 8(a)(2)).

### III.  ANALYSIS

Defendants move to dismiss Plaintiff's complaint pursuant to Fed. R. Civ. P. 12(b)(6).  Defendants argue that Plaintiff cannot establish claims under the Fair Housing Act or the Ohio Civil Rights Act, and, in any event, Western & Southern had no obligation to hire a public relations employee who took public positions against it. Plaintiff argues that she has sufficiently set forth claims for violations of the laws.

**A. Fair Housing Act Claim**

The purpose of the Fair Housing Act ("FHA") is "to provide, within constitutional limitations, for fair housing throughout the United States."  42 U.S.C. § 3601.  The FHA provides, in relevant part:

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title.

42 U.S.C. § 3617.

Here, Plaintiff does not allege that Defendants interfered with the exercise or enjoyment *her* housing rights.  Instead, she claims that Defendants interfered with her employment because she aided or encouraged the women of the Anna Louise Inn in the exercise of *their* rights under §§ 3603, 3604, 3605, and 3606.  (Doc. 12 at 4).

8

To state such a claim sufficiently, Plaintiff must allege that: (1) the women of the Anna Louise Inn are members of a protected class under the FHA; (2) Plaintiff aided or encouraged the women of the Anna Louise Inn in the exercise or enjoyment of a right protected by §§ 3603, 3604, 3605, or 3606; (3) Defendants were motivated in part by an intent to discriminate; and (4) Defendants coerced, threatened, intimidated, or interfered with Plaintiff on account of the her having aided or encouraged the women of the Anna Louise Inn in the exercise or enjoyment of their fair housing rights. *See People Helpers, Inc. v. City of Richmond*, 789 F. Supp. 725, 732 (E.D. Va. 1992); *cf. East–Miller v. Lake County Highway Dep't*, 421 F.3d 558, 563 (7th Cir. 2005).

### 1. Aiding or Encouraging

Plaintiff generally alleges that she acted to aid, assist, and encourage the women of the Anna Louise Inn in the exercise of their FHA rights. (Doc. 1 at ¶ 72). Specifically, she claims to have engaged in protected activity in three instances: when she signed a petition in support of the women of the Anna Louise Inn; when she made financial donations to the Anna Louise Inn; and when she thanked a man who was holding a sign encouraging support of the Anna Louise Inn. (*See* Doc. 12 at 9–10).[3] Defendants argue that these actions do not constitute "aid" or "encouragement" as a matter of law.

---

[3] Plaintiff argues that Defendants must have been aware of this protected activity because her offer was revoked due to her opposition on the Anna Louise Inn issue. (*See also* Doc. 1 at ¶ 94) ("Western & Southern and Ms. Chiodi, accordingly, were aware of Ms. Linkletter's opposition, aiding, and assisting."). Further, Plaintiff specifically alleges "upon information and belief Western & Southern saw the petitions." (*Id.* at ¶ 65). She does not specifically allege that Defendants knew of her financial donations or her thanking of the protester.

Plaintiff cites, and Defendants distinguish, a number of cases in which individuals aided or encouraged others in the exercise of their rights under the FHA. These cases demonstrate that Plaintiff's conduct here did not rise to the level of "aid" or "encouragement" required by the FHA. *See Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1062 (9th Cir. 2004) (tenant of mobile home park "barely" alleged sufficient protected activity when she complained to defendant about its oppressive tactics, filed a lawsuit against defendant, and complained to California officials about defendant's disparate enforcement methods against three female tenants); *Sackman v. Balfour Beatty Communities*, 2014 WL 4415938, No. CV 113-066 (S.D. Ga. Sept. 8, 2014) (plaintiff notified a property management company that her daughter was autistic and requested that the company modify fences to accommodate her daughter's flight risk); *Johns v. Stillwell*, 2009 WL 1408517, No. 3:07-cv-00063 (W.D. Va. May 20, 2009) (plaintiffs' son attempted to assist his mother in removing her property from the lawn after a landlord allegedly evicted the plaintiffs because of their race and warned him, "[b]oy, you better get back in your van and off my land"); *United States v. Sturdevant*, 2009 WL 1211051, No. 07-2233-KHV (D. Kan. May 1, 2009) (resident services coordinator of apartment complex cooperated with HUD investigators and advised a tenant to contact an attorney or HUD about an eviction notice received from a manager, because the manager used racial epithets and slurs, displayed nooses, and treated white residents more favorably); *Buchanan v. Green Meadow Village*, 2006 WL 2583268 (W.D. Mich. Sept. 7, 2006) (plaintiff's distributed HUD materials to other residents which informed them of

their rights under the FHA to be free from housing discrimination);[4] *Kilty v. Maple Grove Condo Ass'n*, 101 F. Supp. 2d 1041 (N.D. Ill. 2000) (Kilty notified a condo association of her husband's Tourette's Syndrome, presented a doctor's letter stating that her husband was working hard to reduce his noise making, and presented a lawyer's letter stating that her husband should not be penalized or threatened because of his disability); *Broome v. Biondi,* 17 F. Supp. 2d 211, 217, 219 (S.D.N.Y. 1997) (shareholder of apartment corporation and lessee of apartment advised black applicants for housing to follow through on the board's approval process, spoke with the building superintendent to facilitate their move into the apartment, called board members to advocate for acceptance of their application for housing, and discussed the issue of race and how it might affect the housing rights of each applicant), *Ores v. Willow West Condo. Ass'n*, 1996 WL 111894, No. 94-C-471712 (N.D. Ill. 1996) (parents aided their two disabled children's attempt to purchase a condo, fought with allegedly discriminating condo association, complained about the condo association's discriminatory rules, and filed a lawsuit); *Grieger v. Sheets*, 689 F. Supp. 835, 836, 840 (N.D. Ill. 1988) (husband tenant encouraged his wife not to sleep with a landlord in exchange for housing and repairs on a rental property); *Rappaport v. Town of Cicero,* 1983 U.S. Dist. LEXIS 10804 (N.D. Ill. Dec. 14, 1983) (social worker worked with African American residents and counseled them to assert their housing and education rights).

---

[4] This was found to be protected activity under a separate regulation—not applicable in this case—stating that distribution of materials "designed to make other persons aware of . . . rights protected under the FHA" was protected. *Id.* (citing 24 C.F.R. § 100.400(c)(4)).

11

In each of these cases, the claimed victim of retaliation claimed that he or she had: given direct and concrete aid to a housing tenant or prospective housing tenant; had done so in connection with the belief that protected-status discrimination was occurring; and engaged in conduct sufficient to put the defendant on notice that he or she was "aiding or encouraging" someone to protect their rights to be free from housing discrimination under §§ 3603–3606.

Plaintiff, on the other hand, has not alleged that she provided any direct or concrete aid to any resident of the Anna Louise Inn. Plaintiff does not allege ever speaking with a resident of the Anna Louise Inn. Further, the petition she signed did not mention or imply—let alone oppose—gender discrimination in housing. (*See* Doc. 1 at ¶ 62). Indeed, the petition did not allege that Western & Southern was doing anything wrong. (*Id.*) Instead, the petition was generic in its support of the Anna Louise Inn, stating that the "Anna Louise Inn should remain where it is and continue its mission of providing safe and affordable housing for single women." (*Id.*) At most, the petition states a preference for the Anna Louise Inn to remain at its current location. This is not the type of aid or encouragement under the FHA that protects an individual from adverse action.

Courts have rejected claims of "aid" and "encouragement" stronger that Plaintiff's. *See Hamilton v. Lincoln Mariners Associates Ltd.*, 2014 WL 5180885 at * 6 (S.D. Cal. Oct. 14, 2014) (plaintiff, who had been diagnosed by the Veterans Administration as 100% disabled, did not engage in protected activity where he notified his apartment complex several times of his disabilities and complained about, among

12

other things, unsatisfactory disabled access ways, excessive noise, and lack of appropriate security); *Mazzocchi v. Windsor Owners Corp.,* 2013 WL 5295089, at *12 (S.D.N.Y. Sept. 17, 2013) (plaintiff did not engage in protected activity where he informed his apartment complex that his live-in girlfriend had bi-polar disorder and post-traumatic stress disorder, having neither "protest[ed] or oppos[ed] discrimination prohibited under the FHA" nor made the defendants aware that he was complaining about discrimination); *Kendrick v. Greenburgh Housing Authority*, 2011 WL 1118664 *9–10 (S.D.N.Y. Mar. 22, 2011) (plaintiff's opposition to defendant's relocating his housing was not protected activity under §3617); *Fincher v. South Bend Hous. Auth.*, 612 F. Supp.2d 1009, 1024 (N.D. Ind. 2009) (plaintiff's lawsuit against housing authority did not constitute protected activity because the lawsuit did not specify claims under the FHA or violation of rights protected under §§ 3603–3606); *Vercher v. Harrisburg Housing Authority*, 454 F. Supp. 423, 424-25 (M.D. Pa. 1978) (plaintiff, an employee of the housing authority, did not engage in protected activity by informing the Urban League of African American tenants' concerns that police did not respond as quickly to complaints by African American tenants because the complaints, although tangentially related to housing, were not about housing discrimination). Even construing Plaintiff's allegations broadly, Plaintiff's claim that her activity is protected under the FHA stretches the law too far.

### 2. Exercise of Rights Under §§ 3603–3606

The type of interference claim that Plaintiff seeks to bring requires her to demonstrate that she aided or encouraged a third party to exercise or enjoy a right protected by §§ 3603–3606. 42 U.S.C. § 3617. These statutory sections prohibit

13

various forms of discrimination relating to housing. *See* 42 U.S.C. § 3604 (prohibiting discrimination in the sale or rental of housing); 42 U.S.C. § 3605 (prohibiting discrimination in residential real estate transactions); 42 U.S.C. § 3606 (prohibiting discrimination in the provision of brokerage services).

A defendant can violate § 3617 without violating §§ 3603–3606. *Hidden Vill., LLC v. City of Lakewood, Ohio*, 734 F.3d 519, 528–29 (6th Cir. 2013). However, the statute is explicit that <u>the rights the plaintiff helped support must be those protected by §§ 3603–3606</u>. 42 U.S.C. § 3617.[5] *See also Bloch v. Frischholz*, 587 F.3d 771, 782 (7th Cir. 2009) (although §3604 was not actually violated, §3617 claim could continue because the alleged protected activity related to protecting §3604 rights); *Dixon v. The Hallmark Companies, Inc*., 627 F.3d 849, 858 (11th Cir. 2010) (plaintiffs' §3617 claim

---

[5] This conclusion is also supported by the cases cited by Plaintiff in her support of her claim that she engaged in protected activity. *See Edwards*, 356 F.3d at 1063 (tenant alleged landlord tried to evict her in retaliation for aiding other female tenants in asserting their §3604 right to be free from gender discrimination in housing); *Sackman*, 2014 WL 4415938 at *10 (plaintiff aided her disabled child in "exercis[ing] a right protected by § 3604 . . . by requesting a reasonable accommodation"); *Johns*, 2009 WL 1408517 at *11 (son "aided and encouraged" his parents, who were allegedly evicted because of race in violation of §3604); *Sturdevant*, 2009 WL 1211051 (employee alleged retaliation for opposing employer housing provider who actively discriminated against minority tenants in violation of § 3604); *Buchanan*, 2006 WL 2583268 at *4 (plaintiff evicted after informing minority tenants of their rights to be free from housing discrimination under § 3604); *Kilty,* 101 F. Supp.2d at 1049–50 (wife claimed retaliation by condo association because she aided husband in protecting §3604 right to be free from disability discrimination); *Broome*, 17 F. Supp.2d at 219 (shareholder of building alleged retaliation when he aided minority tenants in protecting their rights to rent housing free from discrimination under § 3604); *Ores*, 1996 WL 111894 (parents alleged retaliation for aiding their disabled children in protecting their § 3604 rights); *Grieger*, 689 F. Supp. 835 (landlord violated § 3617 when he threatened to kill husband of female tenant because husband encouraged female tenant to resist landlord's sexual advances in violation of § 3604); *Rappaport*, 1983 U.S. Dist. LEXIS 10804 at *12 (social workers aided African Americans to occupy and enjoy their housing rights under § 3604).

dismissed because "[t]he problem with the [plaintiffs'] claim is that they have not asserted rights protected by §3604(b)").

In *Hidden Village*, the Sixth Circuit discussed an example of a § 3617 claim: "Suppose Alice says to Bob, a prospective home buyer, 'If a seller ever discriminates against you because of your race, sue him!' Eve, a racist eavesdropper, becomes enraged upon hearing this conversation and threatens to assault Alice." 734 F.3d at 528–29. The court opined that Eve violated §3617 in threatening Alice, even without an actual violation of §§3603 – 3606. *Id.* However, the hypothetical demonstrates that Alice was encouraging Bob, a prospective home buyer, to protect his rights under §3604 to be free from racial discrimination when purchasing residential real estate. *Id.* Accordingly, the statute still requires Alice to have encouraged "Bob to protect himself against discrimination relating to the sale of housing." *Id.*

Plaintiff claims that the residents of the Anna Louise Inn were enjoying an FHA right when they tried to keep from being forced out of the Lytle Park property. (Doc. 12 at 4) (citing *Halprin v. Prairie Single Family Homes,* 388 F.3d 327, 328–30 (7th Cir. 2004); *George v. Colony Lake Property Owners Ass'n,* 2006 U.S. Dist. LEXIS 45229, No. 05-c-5899 (N.D. Ill. June 16, 2006)). However, Plaintiff did nothing to help the residents buy or rent housing or help them with any real estate transaction. Eventually, Western & Southern purchased the Anna Louise Inn property from another corporation, CUB. (Doc. 1 at ¶ 75). There is no allegation that any resident of the Anna Louise Inn lost housing because of the deal. Nor is there any allegation that the residents of the

15

Anna Louise Inn attempted to purchase or rent or have any housing relationship with Western & Southern as described in §§3603– 3606.

At most, Linkletter argues she aided and encouraged the residents of the Anna Louise Inn to oppose CUB's business transaction with Western & Southern. But this Court has already ruled that that transaction did not involve housing rights under §§3603 – 3606 because Western & Southern was not involved in the sale or rental of residential real estate with the residents. *See Cooper v. Western & Southern Financial Group, Inc.*, Case No. 1:11-cv-00635, 847 F.Supp.2d 1031, 1036 (S.D. Ohio 2012). Instead, the residents brought a claim under the first theory of §3617—that Western & Southern interfered with *their* right to enjoy *their* housing provided by CUB. Plaintiff presents no authority that allows for a §3617 claim to be based on the §3617 claim of another.

### 3. Application of § 3617 to Defendants

To state a claim under § 3617, a plaintiff must allege facts to show that the defendant falls within the scope of the statute, which applies to "actors who are in a position directly to disrupt the exercise or enjoyment of a protected right and exercise their powers with a discriminatory animus." *Hamad v. Woodcrest Condominium Ass'n,* 328 F.3d 224, 236 (6th Cir. 2003) (citing *Babin,* 18 F.3d at 347). In circumstances where an employer is involved in the provision of housing, the FHA has provided a means by which an aggrieved employee may seek relief. *E.g. Gonzalez v. Lee County Housing*

16

*Authority*, 161 F.3d 1290, 1305 (11th Cir. 1998) (claim filed by property manager against housing provider); *Meadows*, 432 F. Supp. at 335 (apartment complex terminated an employee who rented to African American tenants against his employer's orders). However, Plaintiff does not cite to any case in which an FHA interference claim proceeded against a defendant-employer who did *not* operate a housing facility.[6]

Quintessentially, this case presents employment law claims, though it is purportedly brought pursuant to the FHA, and Congress has established separate employment discrimination statutes for such claims. To state it again, Plaintiff seeks to stretch the law too far.

**B. Ohio Civil Rights Act Claims**

Like the FHA, the Ohio Civil Rights Act contains a provision which makes it unlawful to "[c]oerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of that person's having exercised or enjoyed or having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by division (H) of this section[.]" O.R.C. § 4112.02(H)(12). "When interpreting O.R.C. Chapter 4112, Ohio courts have looked to analogous federal statutes and case law for guidance." *Ohio Civil Rights Comm'n et al. v. Harlett, et al.,* 132 Ohio App.3d 341, 344 (1999). Consequently, for the reasons stated above, the Court also

---

[6] In *Walker v. Lakewood*, 272 F.3d 1114, 1126 (9th Cir. 2001), the Court stated that "the FHA nevertheless prohibits employers from canceling [employment-at-will] contracts in retaliation for fair housing advocacy." However, the Court relied exclusively on cases where the employer was a housing provider.

dismisses Plaintiff's O.R.C. § 4112.02(H)(12) claim.[7]

### C. Declaratory Judgment Claim

Plaintiff alleges that Defendants used a "screening system" to determine whether a prospective employee had taken positions contrary to Western & Southern's interests, including with respect to the Anna Louise Inn. (Doc. 1, ¶¶ 114–15). Even taking that allegation as true, Plaintiff fails to state a claim for the reasons set forth above. It is permissible for a company to employ persons who are suited for their job and to reject those whose past conduct has rendered them ineffective. Plaintiff's criticism of Western & Southern's business strategy was not protected activity. There would be no legal obstacle to Western & Southern attempting to screen out applicants for a public relations job who have previously taken public stands against its business plans and strategy.

---

[7] To state a retaliation claim under O.R.C. § 4112.02(I), Plaintiff must establish that she either opposed gender discrimination ("opposition clause") or made a charge, testified, assisted or participated in an investigation, proceeding, or hearing under § 4112.02(I) ("participation clause"). *Booker v. Brown, Williamson Tobacco Co. Inc.*, 879 F.2d 1304, 1312 (6th Cir. 1989); *Dautartas v. Abbott Laboratories*, 10th Dist. Franklin Co. No. 11AP-706, 2012-Ohio-1709, ¶ 48. There is no allegation that Plaintiff engaged in any participation activity. None the alleged protected activities put Defendants on notice that Plaintiff believed Western & Southern was discriminating against women in the provision of housing or that Linkletter opposed such discrimination. Plaintiff's activities merely stated her general support for the Anna Louise Inn as an institution. (Doc. 1 at ¶¶ 62, 66, 69–70). Moreover, Plaintiff admits that she believed Western & Southern purchased the Anna Louise Inn *for economic profit*. (*Id.* at ¶ 37). Vague or unspecific allegations, like those made by Plaintiff in the petition, are insufficient, as a matter of law, to constitute opposition to discrimination. *See Booker*, 879 F.2d 1304, 1313 (6th Cir. 1989) (holding "that a vague charge of discrimination … is insufficient to constitute opposition to an unlawful employment practice."); *Fox v. Eagle Distrib. Co.*, 510 F.3d 587, 591 (6th Cir. 2007) (vague complaints of discrimination that do not reference any alleged act of discrimination do not constitute protected activity). Indeed, Ohio courts require that, "[i]n order to engage in a protected opposition activity [] a plaintiff must make an overt stand against suspected illegal discriminatory action." *Coch v. Gem Indus.*, 6th Dist. Lucas Co. No. L-04-1357, 2005-Ohio-3045, ¶¶ 32-33; *Jackson v. Champaign Nat. Bank & Trust Co.*, 10th Dist. Franklin Co. No. 00AP-170, 2000 WL 1376534 * 7 (Sept. 26, 2000). Plaintiff never communicated such overt opposition.

## IV. CONCLUSION

Accordingly, for the foregoing reasons:

(1) Defendants Western & Southern Financial Group, Inc. and Kim Chiodi's motion to dismiss (Doc. 10) is **GRANTED**; and

(2) The Clerk shall enter judgment accordingly, whereupon this civil action is **CLOSED** in this Court.

**IT IS SO ORDERED**.


Date:  2/18/16                                          *s/ Timothy S. Black*
                                                                            Timothy S. Black
                                                              United States District Judge